IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CT-3079-H

HA NASI SALUT VAYI YISRAEL, )
)
        Plaintiff, )
)
v. ) **ORDER**
)
CHAPLAIN YVONNE BEASLEY, )
et al., )
)
        Defendants. )

Plaintiff Ha Nasi Salut Vayi Yisrael, a state inmate, filed this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., alleging violations of his constitutional rights. Presently before the court is defendants' motion for summary judgment [D.E. # 66], to which plaintiff responded in opposition [D.E. # 76], and plaintiff's motion to amend the complaint [D.E. # 75], to which defendants responded in opposition [D.E. # 77]. These motions are ripe for adjudication.

## STATEMENT OF THE CASE

On June 25, 2008, plaintiff filed this pro se action alleging a violation of his constitutional rights in violation of 42 U.S.C. § 1983 and RLUIPA. Following frivolity review conducted pursuant to 28 U.S.C. § 1915(e)(2), this court entered an order on February 17, 2009, concluding that plaintiff's claims were not clearly frivolous and requesting that North Carolina Prisoner Legal Services ("NCPLS") investigate plaintiff's claims [D.E. # 5]. After conducting an investigation, NCPLS declined to represent plaintiff in this matter [D.E. # 14].

Plaintiff filed a motion for injunctive relief on July 29, 2009 [D.E. # 23], and a motion for summary judgment on September 2, 2009 [D.E. # 24]. Plaintiff filed a motion to amend his

complaint on December 2, 2009 [D.E. # 25]. On February 22, 2010, this court entered an order granting plaintiff's motion to amend and denying the motions for summary judgment and for injunctive relief [D.E. # 26]. The amended complaint added defendants Robert C. Lewis, Director of Prisons; Betty Brown, DOC Chaplain Director; Jackie Parker, Food and Nutrition Director; Gerald J. Branker, Warden of Central Prison; Jimmie Binford, Central Prison Food Service Supervisor; and Chaplain Randall Speer, Central Prison Head Chaplain. The amended complaint also alleged a claim that plaintiff's constitutional rights were violated by the denial of a kosher diet.

Plaintiff filed a second motion for a preliminary injunction on March 5, 2010 [D.E. # 29], and a motion to appoint counsel on April 20, 2010 [D.E. # 32]. Defendants filed a motion for summary judgment on May 25, 2010 [D.E. # 33]. On March 29, 2011, the court granted plaintiff's second motion for preliminary injunction and ordered defendants to provide plaintiff with kosher meals until otherwise ordered by the court, appointed NCPLS to represent plaintiff in this matter, and denied defendants' motion for summary judgment [D.E. # 40]. On April 28, 2011, NCPLS filed a second amended complaint [D.E. # 44].

Between October 14, 2011, and April 16, 2012, plaintiff filed several motions concerning his court-appointed counsel [D.E. # 55, 57, 70-71] and a motion for a temporary restraining order [D.E. # 56], and NCPLS moved to withdraw as appointed counsel [D.E. # 72]. On February 27, 2012, defendants filed a second motion for summary judgment [D.E. # 66]. On April 18, 2012, the court allowed NCPLS to withdraw as counsel and directed plaintiff to file a response to defendants' motion for summary judgment on or before June 4, 2012 [D.E. # 73]. On May 10, 2012, plaintiff moved to amend his complaint [D.E. # 75] and responded in opposition to defendants' motion for summary judgment [D.E. # 76]. On May 30, 2012, defendants responded in opposition to plaintiff's motion to amend [D.E. # 77].

2

## STATEMENT OF THE FACTS

Plaintiff's claims arise out of the denial by the North Carolina Department of Public Safety – Division of Prisons[1] ("DOP") of meals and other items that he requested for religious reasons. At the time plaintiff commenced this action, he was incarcerated at Polk Correctional Institution ("Polk").[2] (Compl. at 2.) In late 2007, plaintiff began to adhere to the beliefs of the Hebrew Israelites after reading a book given to him by a fellow inmate. (2nd Am. Compl. ¶ 13.) Since then, plaintiff has considered himself to be a Hebrew Israelite, and seeks to have the DOP recognize Hebrew Israelite as an approved religious practice. (Id. ¶¶ 14, 31.) In order to practice his religion, plaintiff must follow the instructions of the Torah, which include maintaining a kosher diet, participating in the observation of holy days, attending a congregational reading of the Torah on the Sabbath, and wearing his tallit (prayer shawl) and kippah (skull cap) throughout the entire day, including when he leaves his cell. (Id. at 1 & ¶ 15.)

In January 2008, plaintiff requested that he be permitted to observe several "feast days of God" in accordance with his faith. (Compl. at 3.) In response to this request, defendant Bullock, the Polk chaplain, instructed plaintiff that his "religious perspective is not aligned with what [he was] asking" and that DOP policy required plaintiff to "name/declare a denomination that the [DOP] will recognize as eligible to partake in these feast days." (Compl. at 3-4; see also Carter Decl. [D.E. # 4], Exs. A, D (2/26/08 and 3/19/08 memos from Bullock to plaintiff).) Accordingly, plaintiff completed a faith declaration form that identified his religion as Judeo Christianity. (Compl. at 3-4. However,

---

[1] Effective January 1, 2012, the state of North Carolina reorganized its executive branch by consolidating various agencies; the previous Department of Correction is now the Division of Prisons, a subdivision of the Department of Public Safety. See N.C. Gen. Stat. § 143B-600(a)(1).

[2] On October 14, 2008, plaintiff was transferred from Polk to Central Prison ("Central"), where his additional claims arose. (See, e.g., 1st Am. Compl. at 1; 2nd Am. Compl. ¶ 21.)

3

it appears that defendant Bullock mistakenly believed that plaintiff had declared himself a Seventh Day Adventist, despite a March 24, 2008 memo from Bullock to plaintiff indicating that plaintiff's "[r]eligious [p]reference ha[d] been changed from Moorish Science to Christianity (Judeo)." (Id. at 4-5 & 8 (grievance response form); Carter Decl., Exs. E, F.)

In April 2008, plaintiff "sent in to [defendant] Bullock an inquiry about" Passover, which was about to commence. (Compl. at 4.) On April 17, 2008, Bullock visited with plaintiff for two hours[3] and informed plaintiff that he would "have these days acknowledged." (Compl. at 5.) Despite this assertion, plaintiff was not permitted to participate in the observance of Passover in April 2008 and was not given the appropriate diet as he had requested, causing him to go without any food for seven days. (Id.; see also Carter Decl., Ex. G (memo from Bullock to plaintiff).) On April 20, 2008, the first day of Passover, plaintiff filed a grievance complaining that he was not allowed to observe Passover. (Compl. at 8; see also Beasley Answer ¶ 11.) Defendant Beasley, another Polk chaplain, then investigated the grievance and "determined that [p]laintiff had not declared his religion as Jewish and, per [DOP] policy, could not be served the Passover meal." (Beasley Answer ¶ 6; see also Compl. at 5; 2nd Am. Compl. ¶ 17.) On or about April 28, 2008, Plaintiff asked to be relisted as Jewish in order to be allowed to observe the holy days shared by both Jews and Hebrew Israelites. (Id. ¶ 19.) Polk staff complied with plaintiff's request and noted that plaintiff "should not have any problems observing the Jewish Holy Days in the future as long as he allows his religion to remain Jewish." (Compl. at 8 (grievance response).)

On October 14, 2008, DOP transferred plaintiff from Polk to Central. (2nd Am. Compl. ¶ 21.) Plaintiff asked defendant Binford, the Food Service Supervisor at Central, for kosher meals.

---

[3] It appears that Bullock and plaintiff exchanged repeated correspondence concerning plaintiff's religious views. (Carter Decl.)

4

(Id. ¶ 22; see also Mem. Supp. Mot. Amend [D.E. # 25-3] at 4.) At that time, DOP did not provide kosher meals for inmates.[4] (2nd Am. Compl. ¶ 22.) Additionally, plaintiff could not purchase kosher food from the prison canteen because he was housed in the administrative segregation section.[5] Between October 2008 and November 9, 2009, plaintiff submitted five religious diet request forms to defendant Parker, the DOP Chief of Food and Nutrition Management, in an attempt to receive a diet that adhered to the tenets of his religious beliefs. (2nd Am. Compl. ¶¶ 9, 29.) Although plaintiff repeatedly requested certified kosher meals, DOP employees provided him with a "non-pork (Jewish)" diet. (See, e.g., id. ¶¶ 28, 30 & Ex. D (grievance response).)

On August 8, 2010, DOP transferred plaintiff from Central to Bertie. (2nd Am. Compl. ¶ 39.) In 2011, Bertie staff served plaintiff leavened bread during Passover, which did not adhere to plaintiff's religious beliefs. (Id. ¶ 40.) Plaintiff also received non-kosher meat and leavened bread during Passover in 2010. (Id. ¶ 38; see also Mem. Supp. Mot. Summ. J. at 5.) In March 2011, plaintiff requested a DOP religious assistance request form, but Whitaker responded that defendant Brown, the DOP Director of Chaplaincy, did not want plaintiff to have the form. (Id. ¶ 42.) On March 31, 2011, in light of this court's injunction, DOP transferred plaintiff back to Central in order to receive kosher meals. (Id. ¶ 44.) Although DOP now obtains sealed kosher meals for plaintiff,[6]

---

[4] On February 8, 2010, plaintiff learned from a Central sergeant that another inmate in the mental health unit at Central was receiving kosher meals. (2nd Am. Compl. ¶ 37.)

[5] In 2007, plaintiff assaulted a staff member at Bertie Correctional Institution ("Bertie"), which resulted in his being housed in administrative segregation. (Mem. Supp. Mot. Summ. J. at 3; see also Yisrael Decl. [D.E. # 56-1] at 2-3.

[6] Defendants have submitted the affidavit of Randall Lee, the Deputy Director of the Division of Prisons, who states that plaintiff "has been receiving a completely Kosher meal plan since April 2011. Many of the Kosher food items are specially ordered from an Orthodox-Union . . . certified Kosher vendor." (Lee Aff. ¶ 6.) Moreover, Lee states that where staff must prepare some of plaintiff's food, they do so "in accordance with the instructions from the Kosher vendor." (Id.)

5

Central kitchen staff have on occasion opened plaintiff's meals and/or prepared his foods on surfaces which are not ritually clean according to the tenets of plaintiff's faith. (Id. ¶ 46; see also Lee Aff. ¶ 6; Pl.'s Resp. Opp'n Mot. Summ. J. at 2-4 (raising questions about whether his food is actually kosher and/or being prepared according to the tenets of his faith).)[6] Plaintiff also asserts that he is not receiving soy milk or kosher fruit and grains as required by his faith. (Pl.'s Resp. Opp'n Mot. Summ. J. at 3-4.) As a result, plaintiff suggests that "the hiring of a Mashgiach (Kosher supervisor) for a 12 hour shift is the only way to ensure that the laws of Kashrut in the kitchen are upheld." (Id. at 4.)

DOP is currently revising its Religious Practices Resources Guide and Reference Manual "to include Hebrew Israelites as an approved faith group." (Lee Aff. ¶ 8.) Regardless of whether DOP recognizes a particular religion, "any inmate may privately pray, meditate, and study approved scriptures or approved religious literature at any time in his cell as long as he does not interfere with other inmate(s), assigned program or work assignments, security or institutional management." (Id. ¶ 10.) DOP has restricted plaintiff's ability to wear his kippah and tallit. (See, e.g., id. ¶ 9.) In early 2010, Plaintiff purchased a tallit from Ethiopia, which Central staff initially refused to give him because of its size. (2nd Am. Compl. ¶ 32.) It appears that plaintiff is now allowed to wear his tallit, but not outside of his cell. (Id. ¶¶ 33, 36; see also Lee Aff. ¶ 9; Mot. Amend [D.E. # 41] at 7 & 21-22 (grievance responses).) Plaintiff must also remove his kippah during a search, and it is "subject to restrictions such as size and color." (Lee Aff. ¶ 9.) In January 2012, DOP staff at the direction

---

[6] For example, plaintiff questions whether "the people handling my meals [are] contaminated or clean as pr[e]scribed in Toraic law" and asserts that pans and utensils must be heated to 212 degrees rather than 180 degrees. (Pl.'s Resp. Opp'n Mot. Summ. J. at 2-3.) Plaintiff also asserts that "eating fruit from a tree that was grown during the first three years" and "grain . . . that took root after the 16th of Aviv until after the following 16th of Aviv" also violates Toraic law, and he is not certain whether the fruits and grains served to him comply with these rules.

6

of defendant Speer, the Central chaplain, "lost/destroyed" "plaintiff's religious headwear (kipah/kufi) [because it] was unauthorized." (Mot. Amend [D.E. # 75] ¶ 4.) Additionally, plaintiff mailed his tallit to NCPLS in March 2012, and when NCPLS attempted to mail it back to plaintiff, "defendant Speer advised the mailroom staff that plaintiff could not receive the garment because it did not come from a vendor but from a lawyer who 'by policy is deemed family or friend.'" (Id. ¶ 5.)

DOP asserts that it has established its restrictions on plaintiff's tallit and kippah "based on their determination that head coverings or prayer shawls can be a safety and security risk due to inmates concealing weapons and other items within them." (Lee. Aff. ¶ 9.) Plaintiff acknowledges that a large tallit (such as the one he ordered from Ethiopia in 2010) "would definitely be a security concern in openly wearing it at all times because it would be tantamount to wearing a bed sheet or blanket." (Yisrael Decl. [D.E. # 76-1] at 7.) However, plaintiff now seeks to wear a tallit katan, which plaintiff describes as "a one layered garment that has no pockets and allows no room for slits or incisions to be made for the purpose of concealing a weapon or other contraband." (Id. at 6-7.)

Defendants assert that plaintiff's claims concerning his kosher diet and gaining recognition of the Hebrew Israelite religion are now moot in light of actions they have taken during the pendency of this litigation, and that the restrictions they have imposed on plaintiff's ability to wear a kippah and tallit are justified by security concerns. (Mem. Supp. Mot. Summ. J. at 9-13.)

## DISCUSSION

### I. Plaintiff's Motion to Amend

The court first addresses plaintiff's motion to amend. Because plaintiff seeks to amend his complaint more than 21 days after all defendants have answered the complaint, he may not do so without defendants' consent or leave of the court. Fed. R. Civ. P. 15(a)(2).

7

Although leave to amend should be "freely give[n] when justice so requires," Fed. R. Civ. P. 15(a)(2), a district court has discretion to deny a motion to amend a complaint, so long as it does not outright refuse "to grant the leave without any justifying reason." Foman v. Davis, 371 U.S. 178, 182 (1962). A district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile. See Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).

Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 603 (4th Cir. 2010). Additionally, "belated claims which change the character of litigation are not favored." Smith v. Angelone, 111 F.3d 1126, 1134 (4th Cir. 1997) (internal quotations, alteration, and citation omitted).

Defendants oppose the motion to amend on the grounds that the case has been pending for four years, the court has previously permitted plaintiff leave to amend his complaint three times, discovery has been completed, and plaintiff now seeks to add new claims and parties to this action. (Defs.' Resp. Opp'n Mot. Amend at 4.) The court finds that any further amendment of the complaint is unwarranted and prejudicial to the current defendants in light of the current posture of the case. Accordingly, the court denies plaintiff's motion to amend, and dismisses the proposed amended claims without prejudice. Plaintiff may file them in a separate action if he so chooses.

## II. Defendants' Motion for Summary Judgment

### A. *Standard of Review*

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'"

8

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A mere scintilla of evidence supporting the case is not enough. Anderson, 477 U.S. at 252. The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor. Matsushita Elec. Indus. Co., 475 U.S. at 587.

B. *RLUIPA Claims*[7]

RLUIPA provides, in part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter, 544 U.S. at 721; see Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009).

Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b). The statute defines

---

[7] To the extent defendants complain that "[p]laintiff has failed to offer any evidence . . . demonstrating what the tenets are central to the Hebrew Israelite faith" (Mem. Supp. Mot. Summ. J. at 12) "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005). "The Act defines 'religious exercise' to include 'any exercise of religion, *whether or not compelled by, or central to,* a system of religious belief.'" Id. at 715 (emphasis added) (quoting 42 U.S.C. § 2000cc-5(7)(A)); see Gladson v. Iowa Dept. of Corr., 551 F.3d 825, 832 (8th Cir. 2009).

9

"religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith, 578 F.3d at 251. A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted). The court may "not judge the significance of the particular belief or practice in question." Id. at 187 n.2.

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Smith, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 2012 WL 1655411, at *5 (4th Cir. 2012) (quoting Lovelace, 472 F.3d at 198, n.8). "As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the government." Smith, 578 F.3d at 250. In considering this issue, the court must give due deference "to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted); see also Smith, 578 F.3d at 252. "Security concerns deserve particular sensitivity." Smith, 578 F.3d at 252 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" Couch, 2012 WL 1655411, at *3 (quoting and citing Lovelace, 472 F.3d at 190.)

10

As for plaintiff's claims concerning receiving a kosher diet and gaining recognition of the Hebrew Israelite religion, defendants seek summary judgment on the ground that the claim is now moot in light of DOP's efforts to provide plaintiff a kosher diet and add the Hebrew Israelite religion to DOP's religious practices manual. (Mem. Supp. Mot. Summ. J. at 9-10.) The Fourth Circuit has consistently held that when a prisoner is no longer subject to the alleged unconstitutional condition, the claim is moot. See Rendelman v. Rouse, 569 F.3d 182, 186-188 (4th Cir. 2009); Towns v. Jarvis, 577 F.3d 543, 549 n.3 (4th Cir. 2009); Incumaa v. Ozmint, 507 F.3d 281, 286 (4th Cir. 2007); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (a prisoner's transfer mooted a request for declaratory and injunctive relief but not a request for monetary damages).

Furthermore, in cases where defendants voluntarily discontinue challenged activities in order to render the challenge moot, they must satisfactorily demonstrate (1) that there is "no reasonable expectation" the alleged violation will reoccur; and (2) that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 633 (1979). A defendant asserting mootness by voluntary cessation of conduct bears a heavy burden. Id. Plaintiff seeks to avoid summary judgment on his kosher diet claim by questioning whether certain food items are kosher and whether defendants are complying with kosher laws in preparing or serving some of his foods. Plaintiff also points out that he has received leavened bread during Passover.

Regardless of whether plaintiff's claims are now moot, the court concludes that in light of defendants' significant efforts to provide plaintiff with a completely kosher diet, and their assertion that they are complying with all instructions from a kosher food vendor, plaintiff has not shown that any isolated discrepancies in his food preparation or unintentional errors in serving him leavened

11

bread constitute a significant burden on his religious beliefs. See Colvin v. Caruso, 605 F.3d 282, 293 (6th Cir. 2010) ("Because Colvin has asserted only isolated incidents of DeShambo and Anderson serving him nonkosher food, and because these incidents are not sufficient to sustain his claim, we find no error in the district court's ruling."); Abdulhaseeb v. Calbone, 600 F.3d 1301, 1321 (10th Cir. 2010) ("We accept Mr. Abdulhaseeb's contentions that the jello and pudding were questionable at best, and thus placing them on his tray rendered all the food on the tray contaminated and inedible for him. We are not willing to conclude, however, that every single presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise."); Muhammad v. Sapp, 388 F. App'x 892, 897 (11th Cir. 2010) (finding no RLUIPA violation where prison rejected Orthodox Sunni Muslim inmate's demands "for an alcohol-free lacto-vegetarian diet 'prepared with and served on non-disposable utensils' that had never come into contact with meat or alcohol products or byproducts" and that were "not . . . prepared near meals containing meat or alcohol because of the contamination risk"); Holsombach v. Norris, No. 2:08CV00022, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009) ("[I]t appears that Defendants employ reasonable measures to maintain a division between the main-line food preparation and Kosher food preparation . . . . Defendants cannot be held, however, to an absolute standard. They must take reasonable measures, but are not liable for random incidents of misconduct by inmates."); Bey v. Douglas County Correctional Facility, No. 08-3036-JAR, 2009 WL 274238, at *5 n.38 (D. Kan. Jan. 27, 2009) ("Apparently, plaintiff maintains that his pre-packaged Kosher meals came with holes in the packages and that his Kosher meals were prepared in a non-Kosher environment. Again, this does not meet the substantial burden test."). Moreover, any burden defendants do continue to place on plaintiff's religious beliefs – such as not requiring kitchen staff to ritually cleanse themselves for a 24-hour period or not serving plaintiff fruit bearing a kosher symbol – are justified

12

by the state's compelling interest in avoiding excessive administrative burdens, and plaintiff's proffered alternative – hiring a staff person for 12-hour shifts – is not the "least restrictive means" of furthering that interest. Additionally, defendants have shown that they now recognize plaintiff's faith as an approved practice group. Accordingly, the court grants summary judgment to defendants on plaintiff's claims concerning receiving a kosher diet and gaining recognition of the Hebrew Israelite religion.

As for plaintiff's claim concerning being allowed to wear his tallit and kippah, defendants assume arguendo that they have placed a substantial burden on plaintiff's religious beliefs, but cite unspecified "security and safety concerns" as a compelling governmental interest justifying the restriction. On this issue, defendants bear the burden of proof, and the Fourth Circuit has deemed conclusory assertions of a "'legitimate interest'" without further explanation as "superficial" and insufficient. Lovelace, 472 F.3d at 190; see Smith, 578 F.3d at 252 (justification that policy was "'for security reasons' . . . does not, by itself, explain why the security interest is compelling" (internal citation omitted)). Lee's affidavit wholly fails to "connect[] the . . . restrictions [at issue] to specific . . . security concerns and show[] that those concerns are furthered by the" restrictions. Couch, 2012 WL 1655411, at *4. Moreover, in order to show that the restrictions at issue are the least restrictive means of furthering a compelling governmental interest, defendants must demonstrate, "consistent with the RLUIPA statutory scheme, [that they have] acknowledge[d] and give[n] some consideration to less restrictive alternatives." Id. at *5. Defendants have failed to do so, and have failed to address plaintiff's contention that wearing a tallit katan would satisfy both his religious beliefs and defendants' legitimate security concerns. See, e.g., Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir. 2007); Love v. New Jersey Dept. of Correction, CIV.A. 10-1714 GEB, 2011 WL 345964, at *5 n.14 (D.N.J. Jan. 31, 2011) ("[T]he Court stresses that it does not rule out the

13

possibility that, pursuant to Plaintiff's unique religious beliefs: (a) one might be required to wear a tallit katan in connection with one's prayers, be it, over the clothing or under; or (b) one might be required to wear a tallit gadol as a religious undergarment; or (c) there is no distinction between a tallit katan and a tallit gadol.").

Accordingly, the court denies defendants' motion for summary judgment as to plaintiff's claim concerning being allowed to wear his kippah and tallit and orders an evidentiary hearing on this claim. At the hearing, defendants will be allowed to present evidence on their specific security concerns regarding a tallit katan and kippah. See, e.g., Boles, 486 F.3d at 1183 (collecting cases and noting that "in each of those cases, the court made its decision based on the prison's evidence that its regulation responded to valid security concerns[,] . . . . for example, . . . a lengthy evidentiary hearing, . . . at which senior corrections officers testified that prison security was the impetus behind the challenged regulation").

C. *§ 1983 – First Amendment Claims*

Plaintiff asserts that "The DO[P]'s denial of kosher meals, participation in the observation of holy days, and permission to wear his tallit constitute a violation of Plaintiff's First Amendment right to free religious exercise." (2nd Am. Compl. ¶ 55.) The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. Amend. I. However, a prisoner does not enjoy the full range of freedoms as those not incarcerated; rather state action violates a prisoner's religious rights if it burdens his constitutional rights and is not reasonably related to a legitimate penological interest. Turner v. Safley, 482 U.S. 78, 89 (1987); accord O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). A prisoner asserting a violation of his Free Exercise rights must make two threshold showings. First, he must show that he sincerely holds his religious beliefs. See

14

Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972). Second, he must show that the actions of which he complains substantially burdened his religious beliefs. Id.

In evaluating a prisoner's claim that a prison policy violates his First Amendment rights, the court must evaluate four factors to determine whether the policy is reasonably related to a legitimate penological interest. See Turner, 482 U.S. at 89.

> First, is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? Second, are there "alternative means of exercising the right that remain open to prison inmates"? Third, what "impact" will "accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally"? And, fourth, are "ready alternatives" for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006) (internal citations omitted; quoting Turner, 482 U.S. at 89); see Morrison v. Garraghty, 239 F.3d 648, 655 (4th Cir. 2001); Ryidu-x v. Wolfe, No. WDQ-11-358, 2011 WL 5122633, at *4 (D. Md. Oct. 25, 2011) ("The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. In addition, this Court must examine whether there are alternative means of exercising the right asserted, whether accommodation of the right will impact on the orderly operations of the prison, and whether readily available alternatives to the regulation would be less restrictive.").

Courts have noted that First Amendment claims employ a somewhat similar analysis to RLUIPA claims, but is more deferential to prison officials. See, e.g., Lovelace, 472 F.3d at 198-99 & n.8 (RLUIPA "incorporates" the First Amendment's Free Exercise Clause in that it includes the substantial burden test used in those constitutional inquiries and "expressly refers to the Free Exercise Clause in allocating its burden of proof"); Brown v. Ray, 695 F. Supp. 2d 292, 299 (W.D. Va. 2010); Whitehouse v. Johnson, 1:10CV1175 CMH/JFA, 2011 WL 5843622 at * 5 (E.D. Va.

15

Nov. 18, 2011) ("Similar to RLUIPA, for a claim to prevail under the First Amendment, courts must first determine that the plaintiff engaged in a religious exercise and that the exercise has been substantially burdened. RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States. Thus, because plaintiff failed to allege facts sufficient to establish a substantial burden under the more protective standard or RLUIPA, his claim must fail under the more stringent standard of the Free Exercise Clause.").

The court therefore concludes that defendants are entitled to summary judgment on plaintiff's § 1983 claims insofar as they relate to plaintiff's kosher diet and participation in the observation of holy days. As for plaintiff's claim concerning his tallit, the court concludes that defendants have not sufficiently explained how the tallit katan is not a "'ready alternative[]' for furthering the governmental interest" in ensuring the safety and security of prisoners and prison staff. See Ryidu-x, 2011 WL 5122633, at *5 ("Defendants have provided no regulations, written policies, or legal analysis to defend against Ryidu-x's [Free Exercise] claims . . . and thus are not entitled to summary judgment on this record"); cf. Shaheed v. Winston, 885 F. Supp. 861, 868 (E.D. Va. 1995) (entering judgment for prison officials where they had enacted some accommodations in response to prisoner's Free Exercise complaint and "[o]ther than the reforms already enacted by the defendants, no party has offered, nor can the Court imagine, any ready alternatives").

## CONCLUSION

For the foregoing reasons, plaintiff's motion to amend his complaint [D.E. # 75] is DENIED. Defendants' motion for summary judgment [DE # 66] is GRANTED IN PART and DENIED IN PART. Plaintiff's RLUIPA and § 1983 claims concerning receiving a kosher diet, gaining recognition of the Hebrew Israelite religion, and participating in holy days are DISMISSED.

Plaintiff's RLUIPA and § 1983 claims concerning wearing a tallit and kippah remain. The court hereby SCHEDULES an evidentiary hearing on the remaining claims for September 13, 2012, at 10:00 a.m. at the United States Courthouse in Greenville.

    This 17th day of July 2012.

                                          MALCOLM J. HOWARD
                                          Senior United States District Judge

At Greenville, NC
TEC

17

Case 5:08-ct-03079-H   Document 78   Filed 07/17/12   Page 17 of 17